**CONTINENTAL BAKING CO. et al. v. WOODRING, Governor of Kansas, et al.**
**No. 1444.**

District Court, D. Kansas, Second Division.
Dec. 15, 1931.

KENNAMER, District Judge, dissenting in part.

R. L. Stephens, of Kansas City, Kan., Charles R. Wilke, of Lincoln, Neb., and John C. Grover, of Kansas City, Mo., for petitioners.

Roland Boynton, Walter Griffin, Chas. W. Steiger, and E. H. Hatcher, all of Topeka, Kan., for defendants.

Before McDERMOTT, Circuit Judge, and KENNAMER and HOPKINS, District Judges.

McDERMOTT, Circuit Judge.

Chapter 236, of the Laws of 1931, lays a special tax, based on truck capacity and mileage, upon carriers which carry for hire (public and contract carriers) and upon those who are engaged in the transportation by motor vehicle of property sold in furtherance of any commercial enterprise (private carriers). Such taxes must be used for the maintenance, repair, and reconstruction of public highways, and the administration of the act. It requires a public carrier to procure a certificate of convenience before doing an intrastate business; it requires all carriers to procure a license, and to carry liability insurance. It authorizes the Public Service Commission to promulgate regulations looking to the safe operation of the vehicles of all carriers. Certain carriers are exempted from the act.

The plaintiffs are "private motor carriers of property" as the same are defined by the act; they operate bakeries both within and without the state of Kansas, and use the highways of Kansas to deliver their products to customers within and beyond a radius of 25 miles from the corporate limits of cities of the state. The plaintiffs seek to enjoin the enforcement of the statute on the ground that it is arbitrary and discriminatory, and that it compels private carriers to assume the burdens of common carriers. A motion of the defendants to dismiss the bill for want of equity is now for decision.

A similar attack was made upon this statute by a "contract carrier," and the statute was held to be good as against that attack by this court, Judges Phillips, Symes, and Hopkins sitting. Louis v. Boynton et al., 53 F.(2d) 471. We will adhere to the rulings of that court, as far as pertinent, not only because we agree with them, but for the more fundamental reason that courts of co-ordinate jurisdiction sitting in the same district must not attempt to overrule the decisions of each other, except for the most cogent reasons. This rule, and its careful observance, are, to use the words of Judge Walter H. Sanborn, "essential to the prevention of unseemly conflicts, to the speedy conclusion of litigation, and to the respectable administration of the law, especially in the national courts, where many judges are qualified to sit at the trials, and are frequently called upon to act in the same cases." Plattner Implement Co. v. International Harvester Co. (C. C. A. 8) 133 F. 376, 378; Shreve v. Cheesman (C. C. A. 8) 69 F. 785; Boatmen's Bank v. Fritzlen (C. C. A. 8) 135 F. 650.

The state of Kansas has constructed at great expense a system of improved highways. These have been built in part by special benefit districts and in part by a tax

on gasoline sold in the state and by license fees exacted of all resident owners of automobiles. These public highways have become the roadbeds of great transportation companies, which are actively and seriously competing with railroads which provide their own roadbeds; they are being used by concerns such as the plaintiffs for the daily delivery of their products to every hamlet and village in the state. The highways are being pounded to pieces by these great trucks which, combining weight with speed, are making the problem of maintenance well-nigh insoluble. The Legislature but voiced the sentiment of the entire state in deciding that those who daily use the highways for commercial purposes should pay an additional tax. Moreover, these powerful and speedy trucks are the menace of the highways. That those who use the highways, as the plaintiffs use the highways, are subject to regulation by the state to insure the safety of others on the highways, admits of no dispute. It is likewise settled that such users, although nonresidents and although engaged exclusively in interstate commerce, may be required to contribute to their cost and upkeep. The highways are public property. The amount of the charges and the method of collection are for the state to determine, so long as they are reasonable and conform to some fair and practical standard. Carley & Hamilton v. Snook, 281 U. S. 66, 50 S. Ct. 204, 74 L. Ed. 704, 68 A. L. R. 194, note page 200; Bekins Van Lines v. Riley, 280 U. S. 80, 50 S. Ct. 64, 74 L. Ed. 178; Clark v. Poor, 274 U. S. 554, 47 S. Ct. 702, 71 L. Ed. 1199; Packard v. Banton, 264 U. S. 140, 44 S. Ct. 257, 68 L. Ed. 596; Kane v. New Jersey, 242 U. S. 160, 37 S. Ct. 30, 61 L. Ed. 222; Hendrick v. Maryland, 235 U. S. 610, 35 S. Ct. 140, 59 L. Ed. 385; Note, 68 A. L. R. 200. We are advised that all of the states of the Union excepting five have passed statutes undertaking to regulate such special use of their highways and to exact special compensation therefor.

The constitutional questions presented cannot be decided until the statute has been construed. This statute has not yet been construed by the state courts; nor are we aided by any administrative interpretation of the department charged with its enforcement. The statute was construed in Louis v. Boynton, supra, as far as was necessary for the determination of that case; but there remains for this court to construe several sections of the statute.

■ As in the case of most legislation which is the subject of wide interest and which is amended on the floor and in conference, many questions of construction are raised. Counsel for the plaintiffs make many suggestions which would improve the draftsmanship of the bill, as doubtless they will be able to do as to any bill that may be later enacted. We are not aided in our efforts to construe the law by the hypothetical absurdities which are suggested by counsel and which have come to be the conventional method of presenting constitutional questions, for, as was said by the Supreme Court of Oregon in State v. Kozer, 116 Or. 581, 242 P. 621, 624, the constitutionality of a statute cannot be tested by isolated cases conjured up by fertile imagination; it must be tested by "its general application to the classes affected, and not to certain individuals belonging to such classes. Exact equality is not possible. Practical equality is constitutional equality. The human mind has not yet been able to devise any scheme of taxation which will operate with unerring certainty and equality to all situations that may arise. Southwestern Oil Co. v. Texas, 217 U. S. 114, 30 S. Ct. 496, 54 L. Ed. 688; Bell's Gap R'd Co. v. Pennsylvania, 134 U. S. 232, 10 S. Ct. 533, 33 L. Ed. 892."

■ First looking at the statute as a whole: It is immediately observed that it draws no distinction between residents and nonresidents. Next, it discloses a general intent to levy a reasonable tax for the use of its highways by those who habitually use the highways for business purposes. It divides such users into two general classes, the so-called "public" and "contract" carriers, who are engaged in the business of transportation of property by motor vehicle for hire; and "private" carriers, to which class the plaintiffs belong, who are defined to include "any person engaged in the transportation by motor vehicle of property sold or to be sold by him in furtherance of any private commercial enterprise." The act requires intrastate public carriers to obtain a certificate of convenience and necessity, and provides for the regulation of their charges for services. It requires that private carriers shall apply for a license and furnish certain information, and that, upon the receipt of such information and compliance with the regulations, the license shall be issued. It requires that both public and private carriers conform to certain regulations concerning the safety of the operation of their ve-

hicles, and that both shall provide a bond to indemnify the public against injury. The statute clearly discloses two general plans, one for the control of public carriers, and the other for the control of private carriers. Reading the statute as a whole, there is no difficulty in arriving at the conclusion that the Legislature intended to confine its control of private carriers to matters of taxation and of public safety. The authorities already cited amply sustain the power of the state over all carriers in these two respects.

Two principal questions are presented: The first is whether certain exemptions contained in section 2 of the act are so arbitrary and discriminatory that the entire act must fall; and, second, whether the act imposes upon private carriers duties and obligations which can only lawfully be imposed upon public carriers. Frost v. Commission, 271 U. S. 583, 46 S. Ct. 605, 70 L. Ed. 1101, 47 A. L. R. 457; Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264. But see, Stephenson v. Binford (D. C. S. D. Tex., three-judge court) 53 F.(2d) 509.

We will treat first the question of exemptions. Section 2 of the act provides: "That this act shall not apply to motor carriers who shall operate wholly within any city or village of this state, or private motor carriers who operate within a radius of twenty five miles beyond the corporate limits of such city, or any village, nor to the transportation of live stock and farm products to market by the owner thereof or supplies for his own use in his own motor vehicle; or to the transportation of children to and from school."

■ There can be no serious question as far as the exemption applies to those vehicles operating wholly within any city or village of the state. As to private carriers, this is primarily a taxing statute, and since city streets are neither constructed nor maintained by the state, there is no reason why the state should exact a charge for vehicles which do not use the state highways; nor is there as much occasion for the state to enact statutes looking toward their safe operation in localities where such operation may be controlled by city ordinance; nor can there be any serious question about the exemption as to the transportation of children to and from schools. This public agency can be fairly exempted from taxation for the same reason that municipal bonds are; the question of the safe operation of such vehicles can be properly left to the

school authorities who are directly responsible therefor. Louis v. Boynton, supra, and many state decisions collected in Carley & Hamilton v. Snook, 281 U. S. 66, 50 S. Ct. 204, 74 L. Ed. 704, 68 A. L. R. 194, and note appended thereto, p. 200.

It is strenuously argued that the Legislature has no power to exempt vehicles used in the transportation of live stock and farm products to market by the owner thereof, or supplies for his own use in his own motor vehicle. It is said that flour mills and packing houses might employ a fleet of trucks and send them to the farm to transport wheat and live stock to the mill or the packing house. They might, but they do not. The Legislature knew that as a matter of fact farm products are transported to town by the farmer, or by a nonexempt "contract carrier" employed by him. The Legislature knew that as a matter of fact the use of the highways for the transportation of farm products by the owner is casual and infrequent and incidental; farmers use the highways to transport their products to market ordinarily but a few times a year. The Legislature rightly concluded that the use of the highways for carrying home his groceries in his own automobile is adequately compensated by the general tax imposed on all motor vehicles. It is strenuously urged that Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 586, 75 L. Ed. 1264, is contrary. The statute there involved dealt only with carriers engaged in the business of transportation for hire between fixed termini or over regular routes. That statute undertook to exempt from its operation such public carriers as were engaged in the business of transporting farm products. The Supreme Court held that there was no reasonable ground for distinguishing between two public transportation companies, one of which was engaged in transporting farm products for hire, and another of which was engaged in transporting other products for hire. But, because there is no rational distinction between two public carriers because of the nature of the products carried, it does not follow that no rational distinction may exist between two private carriers. Whatever may be the metaphysics of the situation, it is a fact that there is an actual distinction between carriers in the position of plaintiffs, who operate fleets of trucks in the conduct of their business and who use the highways daily in the delivery of their products to their customers, and a farmer who hauls his wheat or live stock

to town once or twice a year. As was said by this court in Louis v. Boynton, supra, there is a distinction between those who use the highways but casually and those who use them habitually and continually. In Carley & Hamilton v. Snook, 281 U. S. 66, 50 S. Ct. 204, 207, 74 L. Ed. 704, 68 A. L. R. 194, the court held that the state might exempt altogether vehicles weighing less than 3,000 pounds, although their loaded weight may be much more than vehicles not exempt. The court said that the tax might be laid upon vehicles according to their propensities to injure or destroy the highways, "and may exempt those with respect to which this tendency is slight or nonexistent." And in Bekins Van Lines v. Riley, 280 U. S. 80, 50 S. Ct. 64, 74 L. Ed. 178, the court sustained a statute directed at common carriers alone, on the ground that their use of the highways would be regular and frequent and expose the public to dangers exceeding those consequent upon the occasional movements of other carriers. Alward v. Johnson, 282 U. S. 509, 51 S. Ct. 273, 75 L. Ed. 496, is to the same effect. We think the Legislature had a right to take into consideration the fact that, as business is now conducted, the transportation of live stock and farm products to market by the owners occasions but a casual and infrequent use of the highways, while the transportation of the finished product to the ultimate consumer is accomplished generally by the sellers, and that their use of such highways is habitual and constant.

■ When the Legislature acts within the scope of its legislative power, when no facts are disclosed as to the reasons which actuated the legislation, the presumption of constitutionality stands, unless no fair reason can be ascribed for the legislative action. Hardware Dealers' Ins. Co. v. Glidden, 52 S. Ct. 69, 76 L. Ed. ——; O'Gorman v. Hartford Ins. Co., 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324; Standard Oil Co. v. Marysville, 279 U. S. 582, 49 S. Ct. 430, 73 L. Ed. 856. That a legislative classification should stand, "if any state of facts reasonably can be conceived that would sustain it"; that the burden is on the assailant to show that the classification is "essentially arbitrary"; that the Legislature has a "wide scope of discretion" in classification; that "mathematical nicety" is not required; and that "some inequality in practice" is not fatal—see Lindsley v. Natural Carbonic Co., 220 U. S. 61, 78, 31 S. Ct. 337, 340, 55 L. Ed. 369, Ann. Cas. 1912C, 160; State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 537, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464; Brown-Forman Co. v. Kentucky, 217 U. S. 563, 573, 30 S. Ct. 578, 54 L. Ed. 883; Munn v. Illinois, 94 U. S. 113, 132, 24 L. Ed. 77. It is abundantly settled that the Legislature may consider the difficulties of administration in the enactment of statutes. In Purity Extract & Tonic Co. v. Lynch, 226 U. S. 192, 33 S. Ct. 44, 57 L. Ed. 184, it was held that the difficulties besetting the administration of a law were sufficient to authorize the placing of an innocent article within a proscribed class. See, also, Ruppert v. Caffey, 251 U. S. 264, 283, 40 S. Ct. 141, 64 L. Ed. 260; Hebe Co. v. Shaw, 248 U. S. 297, 303, 39 S. Ct. 125, 63 L. Ed. 255; Euclid v. Ambler Co., 272 U. S. 365, at page 389, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Tyler v. United States, 281 U. S. 497, 505, 50 S. Ct. 356, 74 L. Ed. 991, 69 A. L. R. 758.

■ One reason for this exemption, and the exemption next discussed, immediately occurs to us. It is a matter of common knowledge that one of the most serious problems connected with legislation such as this is the problem of administration and the cost thereof. One of the reasons for exempting small incomes from taxation was the cost and expense of collection. If laws are placed upon statute books, they should be enforced. The problem of enforcing such statutes as the one now before us is not a simple one, and the cost of collection of the tax is an item that must be considered. It is a well-known fact that business concerns, such as plaintiffs, keep books, and it is comparatively simple to ascertain the mileage of their trucks. A different problem is presented if an effort is made to require a record of the mileage of the trucks of farmers and others incidentally using the highways. It is undoubtedly true that it would require a veritable army of inspectors if a sincere effort was made to ascertain the mileage of every farmer's truck in Kansas. The cost of collection might exceed the tax. We are not prepared to say that the Legislature, which presumably has considered all of these elements and has made a serious effort to meet this problem, has exceeded its powers in exempting such casual uses from the operation of this law.

■ A more troublesome question concerning exemptions is that provision which exempts private carriers "who operate within a radius of 25 miles beyond the corpo-

rate limits of such city." The plaintiffs urge that 'this is so uncertain and indefinite as to be entirely unenforceable, and present in support of that statement several interpretations which border on the fantastic; one of such interpretations being that, if a private carrier starts on an uninterrupted journey across the state, it passes through a series of exempt circles of 25-mile radii, and becomes exempt from taxes whenever it is within one of those circles, and taxable as soon as it passes without. The practical result of this construction would be to exempt all private carriers from tax, for it is quite doubtful whether there is any highway in Kansas that is not within 25 miles of some city or village. Manifestly the Legislature did not intend that. "A literal application of a statute which would lead to absurd consequences is to be avoided whenever a reasonable application can be given which is consistent with the legislative purpose." United States v. Ryan, 52 S. Ct. 65, 68, 76 L. Ed. ——; United States v. Katz, 271 U. S. 354, 46 S. Ct. 513, 70 L. Ed. 986. Counsel for the Public Service Commission suggests that the law means that a nonresident has a 25-mile exemption radius from the actual point of his entry in the state of Kansas, or from his established place of business in the state. We cannot agree entirely with this construction. Until we had the benefit of the ingenious argument of counsel for the plaintiffs, we had little doubt as to the actual intent of the Legislature in enacting this exemption. The Legislature very properly intended to exempt those vehicles which regularly and habitually operate within the limits of the city, such as the delivery trucks of the retail store. The Legislature realized that around every city of the state there was a penumbra of towns that was outside the city limits; that in their daily routine these city delivery trucks cross the city limits repeatedly in going back and forth into these outlying additions. In so doing, the trucks use the state improved highways but slightly, for the streets of these outlying additions are not generally a part of the state system. Furthermore, the practical difficulty of keeping track of the mileage of such delivery trucks as they cross back and forth is well-nigh insuperable; the revenue to be gained from such use would be insignificant and the cost of collection large. The records disclose that, when the bill was originally presented, its limit was fixed at three miles, which would take in the outlying trade territory of most of the cities, although there are some that extend beyond that. There

was some support for the flat 50 miles exemption contained in the North Carolina statute. The result was the compromise contained in this section.

We have little doubt of the power of the Legislature to add to the city limits this twilight zone of trade territory both because of the problems of administration presented, and because of the fairness of it; and, as long as residents and nonresidents are treated alike within this twilight zone, we think the Legislature did not exceed its powers. In our opinion the decision of the Supreme Court of the United States in Clark v. Maxwell, 282 U. S. 811, 51 S. Ct. 211, 75 L. Ed. 726, is conclusive. That case involved the North Carolina statute which levied a tax on all carriers for hire which operated between fixed termini that were more than 50 miles apart. The plaintiff in that case was a carrier which operated between termini some of which were less than 50 miles apart, and some more than 50 miles apart. He attacked the law on the ground that there was an arbitrary discrimination in favor of carriers who used the highways for less than 50 miles and as against those who used the highways for more than 50 miles, and made many of the same arguments that are presented here, to the effect that the wear and tear on the highways is quite as serious where a dozen trucks operated less than 50 miles as one truck that operated 55 miles. The Supreme Court of North Carolina sustained the tax, holding that, since all were treated alike within and without the 50-mile zone, the Legislature had a right to say that the privilege of operating a truck for more than 50 miles was greater than the privilege of operating a truck for less than that distance, and that such a distinction was sufficient to support the classification. Clark v. Maxwell, 197 N. C. 604, 150 S. E. 190. The Supreme Court of the United States affirmed without opinion. Clark v. Maxwell, 282 U. S. 811, 51 S. Ct. 211, 75 L. Ed. 726. If the Legislature has the power to exempt a class that uses the highways for less than 50 miles, it has a right to exempt a class that uses the highways within a radius of 25 miles. Both exempt a local use.

A case squarely in point is that of State v. Kozer, 116 Or. 581, 242 P. 621, 622, where the Oregon statute exempted vehicles which operated "exclusively within the boundaries of incorporated cities or towns of the state of Oregon or within five miles beyond the boundaries of such cities or towns" and also exempted trucks "used ex-

clusively in delivery to market of the products of husbandry by the grower and owner thereof." The same attack was made there as is made here. The Supreme Court of Oregon sustained the law, saying that it was of course reasonable to exempt motor vehicles used only in cities, and as to the five-mile radius said: "Business houses are occasionally obliged to deliver articles of commerce to customers beyond corporate limits, and the Legislature, in the exercise of its discretion, granted to this class the privilege of so using the highways beyond corporate limits within a limited radius. This concession is not unreasonable, in view of the fact that our wonderful system of highways could not have been built nor maintained were it not for the thousands of owners of commercial vehicles whose places of business are in cities and who seldom use the highways, yet pay their just portion of this public burden."

Of course, 25 miles is further than 5 miles; and it does seem that a 25-mile exemption, even for facility of administration, is pretty far. But, if the state has the power to create this penumbra about the city, the question of the distance must be left to the Legislature, unless it is clearly arbitrary. The language of Justice Holmes, while in a dissenting opinion, is an apt statement of a familiar principle of law: "When a legal distinction is determined, as no one doubts that it may be, between night and day, childhood and maturity, or any other extremes, a point has to be fixed or a line has to be drawn, or gradually picked out by successive decisions, to mark where the change takes place. Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." Louisville Gas & Electric Co. v. Coleman, 277 U. S. 32, 41, 48 S. Ct. 423, 426, 72 L. Ed. 770.

A recent case that distinctly recognizes the propriety of a classification predicated upon difficulty of administration and accounting is Chicago, R. I. & P. Ry. Co. v. United States, 52 S. Ct. 87, 91, 76 L. Ed. ——. There railroads of less than 100-mile length were exempted from certain features of the car rental order of the Interstate Commerce Commission; this exemption was sustained because it relieved the small carriers "from the burden of keeping account of a multitude of separate per diem charges, and reporting them separately to the various trunk lines." It was noted that the longer lines maintained large accounting forces. So here the bakeries keep books; the farmers do not. Long hauls are easily recorded, and the tax will pay for the inspection; but the burden of computing and collecting a tax from the delivery truck which occasionally crosses the city limits is disproportionate to the tax involved.

A Texas statute, approved June 11, 1931 (Laws Tex. 1931, c. 282, [Vernon's Ann. P. C. art. 827a]), regulated the length and width of trucks, but exempted implements of husbandry, well-drilling and highway construction machinery, trucks operating exclusively within a city, and all vehicles engaged in carrying property from the point of origin to the nearest common carrier loading point, and from such loading point to destination. These exemptions were assailed before the United States District Court of Texas, three judges sitting. The statute was construed by that court as exempting farm machinery only as it moved from field to field, and, as so construed, sustained the validity of that and all other exemptions. The origin-to-common carrier exemption was sustained because of the short haul involved. Sproles v. Binford (D. C.) 52 F. (2d) 730, 734. In 1887, the state of New York passed a statute prohibiting the use of stoves in passenger cars, but exempted railroads of less than 50 miles in length. The Supreme Court of the United States denied the contention that such exemption resulted in an arbitrary classification. New York, etc., Railroad v. New York, 165 U. S. 628, 17 S. Ct. 418, 41 L. Ed. 853.

While the act is primarily a taxing statute, it does contemplate regulations looking to the public safety. The exemption of the farmer from such regulations can be sustained on the familiar ground that he makes but casual use of the highways for transportation of his products. The 25-mile exemption is probably sustainable on the ground that the trucks exempted are domiciled in and generally use the city streets: indeed they must use them to get to the city limits; and such trucks are subject to the control of city authorities in these respects. Again, plaintiffs' trucks are exempted within this zone as are all others like situated.

 But it is urged that the statute is not susceptible of this construction; it is said that the statute exempts any carrier which operates within a radius of 25 miles beyond the city limits. We think that this phrase must be read in connection with the first phrase of the sentence. The first phrase exempts all carriers who operate wholly within the city limits; a distinction was then intended to be drawn in favor of private carriers who operated within the 25-mile zone outside of the city. So the phrase in question was inserted. It is also to be observed that the phrase uses the expression "within a radius." The use of the word "radius" indicates a center. That center must be the city. What city? The statute says "such city." "Such" refers back to motor carriers "who operate wholly within any city." We think a fair construction of the statute is that there are exempted private carriers who have an established place of business within a city, be they resident or nonresident, and who use that city as the center of the operations of that vehicle. The bill alleges that one of the nonresident corporations maintains bakeries in several cities of the state. Connected with those bakeries are delivery trucks. Such trucks may be said to be domiciled in that city. Such trucks may operate in and about that city, within a radius of 25 miles, exempt from the tax. Nor is it necessary that a carrier should have a bakery in the city. We are of the opinion that, if a bakery were operated in Kansas City, Mo., and domiciled trucks in the city of Topeka, for delivery in Topeka and environs, the bread could be hauled from Kansas City, Mo., to Topeka, by trucks (such trucks paying the tax), but that it could then be turned over to the domiciled trucks, which could deliver their bread in Topeka and within the 25-mile radius, exempt from the tax. Although the language is not entirely apt, we think it can and should be construed as intending to exempt from the tax those carriers who either have an established place of business or an established delivery point, with trucks domiciled in any city, and that such trucks may operate in that city and within a 25-mile radius free of any tax; if such a truck goes beyond the 25-mile limit, we agree with the construction of the commission, that only the excess is taxable. It is true that sometimes that excess would be difficult of ascertainment; but that is a legislative problem. It is our duty to construe the law so as to make it constitutional if it is fairly susceptible of such a con-

struction. So construed, we believe the exemption not to be so arbitrary as to trespass upon the constitutional limitations. This conclusion is strongly buttressed by the fact that the nonresident plaintiffs are treated exactly like residents, in that they may domicile a truck in any city and be entitled to the exemption.

The point urged by counsel for the plaintiffs that the 25-mile zone is larger around a large city than around a small city is mathematically but not legally sound. The Supreme Court of the United States in Chicago, R. I. & P. Ry. Co. v. United States, supra, met a similar argument by the simple statement that it is not enough to show that "mathematical accuracy in the adjustment of the burden may not be attained."

 The next claim is that section 5 of the act, which is set forth in the margin,[1] imposes upon private carriers the duties and obligations of common carriers. If this is true, the Legislature has probably exceeded its power, although Circuit Judge Hutcheson, speaking for a three-judge court, may have otherwise held. Stephenson v. Binford, supra. But we do not so read section 5. The first sentence of section 5 deals solely with public carriers and gives to the commission the power to fix its rates. The second sentence deals with both public and private carriers, and gives the commission power, not over rates or charges, but

[1] Sec. 5. The public service commission is hereby vested with power and authority and it shall be its duty to license, supervise and regulate every public motor carrier of property or of passengers in this state and to fix and approve reasonable maximum or minimum or maximum and minimum rates, fares, charges, classifications and rules and regulations pertaining thereto. And the public service commission is hereby vested with power and authority and it shall be its duty to license, supervise and regulate every public motor carrier of property or of passengers, contract motor carrier of property or of passengers and private motor carrier of property in the state and to regulate and supervise the accounts, schedules, service and method of operation of same; to prescribe a uniform system and classification of accounts to be used; to require the filing of annual and other reports and any other data; and to supervise and regulate "public motor carriers of property or of passengers," "contract motor carriers of property or of passengers" and "private motor carriers of property," in all matters affecting the relationship between such "public motor carriers of property or of passengers," "contract motor carriers of property or of passengers" and "private motor carriers of property" and the traveling and shipping public. The public service commission shall have power and authority by general order or otherwise to prescribe reasonable and necessary rules and regulations governing all such motor carriers. All laws relating to the powers, duties, authority and jurisdiction of the public service commission over common carriers are hereby made applicable to all such motor carriers except as herein otherwise specifically provided.

over their bookkeeping and their relations to the traveling and shipping public. If this tax is to be collected, some books of account must be kept by the carriers that will reflect the mileage of their trucks. The Legislature has power to authorize the commission to require such bookkeeping and such reports as will accurately reflect the mileage of the trucks. It is not to be assumed that the commission will go further than this, with reference to private carriers. If it does go further, the regulation, and not the statute, would be invalid. The same sentence refers to the "method of operation of same," and the last phrase authorizes the commission to regulate the carriers in their relations with the traveling and shipping public. As far as private carriers are concerned at least, this power is limited to such regulations as will protect other travelers and shippers on the highway and protect the highways themselves. Under this power it can control, within reasonable limitations, the width, the length, the height, the weight, the speed, the lights, the brakes, on these large and speedy trucks which continually use the highways. Such regulations, and others that may occur to the commission, are appropriate for the protection of travelers and shippers who are also entitled to the use of the highways. So construed, the authority granted is well within the police powers of the state. The last sentence deals solely with common carriers, and extends the laws relating to common carriers to "all such motor carriers," which by the simplest rules of grammatical construction, refers to public and not to private carriers.

[30] It is claimed that section 8 is invalid, in that it requires a private carrier to procure a license. Section 8 should be read in connection with section 7, which forbids public carriers to operate an intrastate business without "a certificate of convenience and necessity." Section 8 deals with a license and not with a certificate of public convenience. It makes it mandatory upon the commission to issue the license upon receipt of certain information and upon payment of the fees required. Every automobile driver in the state of Kansas must have a license. Such section requires that "An application shall be made to the public service commission in writing stating the ownership, financial condition, equipment to be used and physical property of the applicant, and such other information as the commission may request."

The ownership and financial condition of the applicant is a matter of interest to the commission in connection with the collection of the tax; the question of the equipment and physical property connected therewith is of interest to the commission in the matter of public safety, particularly with reference to the condition of steering gears and brakes. Until the commission requires information which has no reasonable bearing on the ability of the applicant to pay the tax, or has no relation to the safety of his equipment, the plaintiff's rights have not been invaded.

 The next section under attack is section 21, which is copied in the margin.[2] This court, in Louis v. Boynton, supra, construed this section as not requiring security for passengers or cargoes carried, but only to protect third persons from injuries to their persons or property. So construed, the section is clearly within the powers of the state. That no such bond is required of automobile owners generally is not arbitrary. Plaintiffs complain that the last sentence of section 21 provides that no city shall require any additional bond. It seems to be fair to say that, if one bond is given, another shall not be required. But plaintiffs are not hurt by this. They can give all the bonds they wish, without let or hindrance.

 The next section attacked is section 22, which is in the margin.[3] This section

[2] Sec. 21. No certificate or license shall be issued by the public service commission to any "public motor carrier of property," "public motor carrier of passengers," "contract motor carrier of property or passengers" or "private motor carrier of property," until and after such applicant shall have filed with, and the same has been approved by, the public service commission, a liability insurance policy in some insurance company or association authorized to transact business in this state, in such reasonable sum as the commission may deem necessary to adequately protect the interests of the public with due regard to the number of persons and amount of property involved, which liability insurance shall bind the obligors thereunder to pay compensation for injuries to persons and loss of or damage to property resulting from the negligent operation of such carrier. No other or additional bonds or licenses than those prescribed in this act shall be required of any motor carrier by any city or town or other agency of the state.

[3] Sec. 22. The commission shall promulgate and publish in the official state paper, and mail to each holder of a certificate or license hereunder, such regulations as it may deem necessary to properly carry out the provisions and purposes of this act. The commission may at any time, for good cause, suspend, and, upon at least five days' notice to the grantee of any certificate and an opportunity to be heard, revoke or amend any certificate. Upon the commission finding that any public carrier does not give convenient, efficient and sufficient service as ordered, such public carrier shall be given a reasonable time to provide such service before any existing certificate is revoked or a new certificate granted. Any rules promulgated by the commission shall include: (a) Every vehicle unit shall be maintained in a safe and sanitary condition at

deals in part with public carriers and in part with all carriers. As far as private carriers are concerned, it enables the commission to promulgate rules which shall include the requirement that every truck shall be maintained in a safe and sanitary condition at all times. Certainly all trucks on the highway ought to be maintained in a safe condition, and the plaintiffs, hauling foodstuffs, ought not to complain if their trucks are required to be kept in a sanitary condition. Operators of private carriers shall be 16 years of age, and shall be of good moral character and fully competent to operate the truck. The age requirement is valid; the operators should be of good moral character at least to the extent that they are not addicted to drink or opiates; and they should have enough character to stop and assist the injured in case of an accident. The commission's power to regulate the hours of service is vital to the safe operation of trucks. A considerable percentage of accidents on the highway are occasioned by those who have driven so long that they have become sleepy or their senses have become numbed. It is not to be presumed that plaintiffs of the standing of these plaintiffs, dealing constantly with the public, would want to equip their trucks with drunken drivers, or to press them to such long hours of service that their faculties have become dulled. Neither is it to be presumed that the commission will make any requirements as to character, or any requirements as to hours of service, that do not have a direct relation to the safety of the operation of the vehicle. If the commission does make some such regulation, the regulation would be invalid, and not the statute; and, unless the plaintiffs desire to employ drunken or hit-and-run drivers, or unless the plaintiffs want to work them so long that their senses are dulled, the plaintiffs are not hurt. We think that section 22 has a direct bearing upon the safety of

all times. (b) Every operator of a motor vehicle used as a public carrier shall be at least twenty-one years of age; and every operator of other carriers to which this act applies shall be at least sixteen years of age; and all such operators shall be of good moral character and fully competent to operate the motor vehicle under his charge. (c) Hours of service for operators of all motor carriers to which this act applies shall be fixed by the commission. (d) Accidents arising from or in connection with the operation of carriers shall be reported to the commission in such detail and in such manner as the commission may require: Provided, That the failure to report any such accident within five days after the happening thereof shall be deemed willful refusal to obey and comply with a rule of the commission. (e) The commission shall require and every carrier shall have attached to each unit or vehicle such distinctive marking as shall be adopted by the commission.

the highways and is within the power of the state.

The plaintiffs rely principally upon Smith v. Cahoon, supra. That was an appeal from the Supreme Court of Florida (99 Fla. 1174, 128 So. 632), which had denied a writ of habeas corpus to the appellant. The appellant had been arrested for operating a truck without a license. The statute undertook to exempt such public carriers as were engaged in the transportation of agricultural, horticultural, and piscatorial products. To thus distinguish between two public carriers, each of which is engaged in the transportation for hire, and each of which was a habitual and continual user of the highway, on account of the nature of the product carried, was held to be unconstitutional. Moreover, the statute contained provisions which could only be legally applicable to common carriers and other provisions which could be applicable to all carriers, but these provisions were intermingled. When the appellant was arrested, the statute had not been construed. The question to be determined was whether or not the appellant could be restrained of his liberty for violating the statute, the terms of which were obscure, and which had not been construed by the courts. He was released. But the Supreme Court stated: "It should be observed that this is not an action in equity where the enforcement of a statute awaits the final determination of the court as to validity and scope." The present case is such an action. The Supreme Court further said that "but, until such separation has been accomplished by judicial decision" the statute remained uncertain. But the provisions of the Kansas statute are not so hopelessly intermingled as the Florida statute; and, in the second place, the statute has now been construed and nobody is deprived of his liberty. We do not believe that the Cahoon Case controls this case.

Finally it is urged that the statute is in conflict with the interstate commerce clause of the Constitution (art. 1, § 8, cl. 3). As to private carriers, no discrimination is made between those engaged in intrastate and those engaged in interstate commerce. It has been repeatedly held, in the cases heretofore cited, that the exaction of a fair compensation for the use of the highways of the state, and the enforcement of reasonable measures looking toward the safety of the public on such highways, is not an undue interference with interstate commerce.

The argument of plaintiffs, particularly

as to the 25-mile exemption, is logically strong, although we do not see how it works any real discrimination against them, since all within the zone are treated alike. The real objection of the plaintiffs is to the payment of the tax; but the tax is reasonable in amount, and those who, like plaintiffs, constantly use the highways as an adjunct to their business, ought to pay their share of maintenance. The question of constitutionality of this statute is not free from doubt; but the rule is as settled as it is sound, that in case of doubt the statute should be upheld.

It follows that the bill should be dismissed and the temporary restraining order heretofore issued should be dissolved. If the plaintiffs desire to appeal, a stay of this order will be granted for a reasonable time in which to perfect the appeal, and until the appeal is determined, provided that the plaintiffs keep and furnish to the commission a record of the mileage of their trucks subject to taxation, and either pay the taxes under protest, or give a bond to be approved by the clerk of this court in sufficient amount to insure the payment of such taxes if this decision is affirmed. It is so ordered.

KENNAMER, District Judge (dissenting).

I concur in the opinion of the majority in so far as the same construes the Kansas Highway Act that the statute has as its purposes the regulation of the highways and taxation.

I dissent from the views expressed by the majority sustaining the constitutionality of the act. The exemption of motor carriers who operate within radius of 25 miles beyond corporate limits of any village or city is an unreasonable discrimination in favor of such operators. The necessity for the protection of the public on the highways within radius of 25 miles is just as great or greater as beyond such radius, as the probabilities of damage to persons or property would be more likely than beyond such radius. The case of Smith v. Cahoon, 283 U. S. 553, 51 S. Ct. 582, 75 L. Ed. 1264, seems to me to be controlling.